IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:23-cr-150-REP |
| KUMKIO MARTIN, | |
| *Defendant*. | |

### Government's Opposition to Defendant's Motion to
### Suppress Evidence Derived From the Flock Camera System

Kumkio Martin is charged with Hobbs Act robbery, using a firearm during a crime of violence, and possession of a firearm as a convicted felon. During their investigation into the robberies, the police used a database of images from cameras equipped with automated license plate recognition ("ALPR") technology to obtain the license plate number and photos of the getaway car. Martin argues that the use of the ALPR database infringed upon his Fourth Amendment rights and asks the Court to suppress the evidence derived from this "search."

The Court should decline to do so. Martin has not shown that he had a reasonable expectation of privacy. There is no privacy interest in a car's license plate number or movements along public thoroughfares. And Martin has neither alleged nor shown that the police used the ALPR database to track the totality of his movements for a sustained period of time. Accordingly, using the database did not infringe upon any Fourth Amendment right.

Even if the Court disagrees, it should still deny the suppression motion. The officers investigating the case gathered the evidence in good-faith reliance on binding appellate precedent and valid search warrants.

## BACKGROUND

### I.    The April 2023 Robberies

At about 8:27 am on April 22, 2023, two victims were robbed at gunpoint on Dunston Avenue in Richmond.  The robber walked up to them, took out a small blue handgun, pointed it at them, and demanded their wallets.  The victims described the incident and the robber to police officers who arrived on the scene.

A nearby Valero gas station had security cameras that recorded the robbery.  The footage shows a four-door sedan backing into an alley beside the Valero.  The robber exited the car, walked across the street to the victims, robbed them, then ran back to his car and drove off.  Cameras from a local beauty salon and a 7-Eleven also recorded the incident.

Detective Eric Sandlin, with the Richmond Police Department, gathered the video footage from these businesses and identified the suspect's car as a four-door Acura with a moon roof and stickers on the two rear passenger windows.  The footage did not show the car's license plate. Sandlin sent out a vehicle-of-interest flyer with a description and pictures of the car to local law enforcement personnel.

The next day, Chesterfield County police officers responded to two incidents—an attempted breaking and entering and an armed robbery—that happened seven miles away from the Dunston Avenue robbery.  In the first incident, a man tried to break into a closed convenience store ("Your Store") at around 10:15 pm.  He fled after failing to open the locked door.  Footage from the store's video camera showed the suspect running toward Reams Road.

The armed robbery happened at a BP gas station about ten minutes later.  The BP is around three miles away from the Your Store, and the most direct route between the two locations requires driving down Reams Road.

The robber walked into the BP convenience store, pointed a gun at the victims, and demanded money and cigarettes.  The robber took the victims' iPhones, as well as a bag containing a laptop, payroll checks, credit cards, cash, and car keys.

Again, security cameras belonging to local businesses captured the robbery.  The BP's cameras show that the robber was wearing a yellow jacket, a ski mask, a reddish pink glove, and that he had a small blue or teal-colored gun.  Footage from a nearby Food Lion camera shows that a sedan resembling the Acura pulled into a parking lot near the BP.  A man in a yellow jacket exited the car, went into the BP convenience store, came out about three minutes later, and ran back to the car.  Chesterfield Detective Joshua Hylton reviewed the footage and saw that the BP robber's height, weight, and distinctive clothing matched the suspect from the Your Store incident.

## II.    The Flock Database

The investigations into the April 2023 robberies involved the use of Flock Safety's ALPR database.  Flock sells cameras equipped with license plate reading technology to law enforcement agencies and neighborhood associations, and the company maintains a database of the pictures of cars that these cameras take.  Flock stores these images for 30 days, then deletes them.

After the Dunston Avenue robbery, Detective Sandlin gave pictures of the getaway car to Richard Redford, a Master Patrol Officer with the Richmond Police.  Redford used the Flock database to identify the car's license plate number.  He did so by running a search for all silver sedans in the Richmond area.  The resulting search produced over 2,500 images.  Redford manually searched through these pictures for an Acura sedan with stickers on the rear passenger windows. After several hours of searching, Redford identified a gold Acura with stickers on the rear passenger windows and a Virginia license plate number UAL-6525.  *See* Decl. of Officer Richard Redford, Ex. 1 at 2.

Separately, after the BP robbery in Chesterfield, Detective Hylton accessed the Flock database to look at images taken by a camera on Reams Road around the time of the Your Store and BP incidents. Hylton saw a picture of the Acura with a license plate number UAL-6525 driving on Reams Road shortly before the BP robbery. As Hylton developed this lead, he learned that the Richmond Police Department was also investigating the Acura. Chesterfield and Richmond police then began to coordinate their investigations.

The officers determined that the Acura was registered to Breona Reid, and that Reid lived at an apartment on Lamplighter Court in Chesterfield. On the day of the Dunston Avenue robbery, a Flock camera at the intersection of Stella Road and Lamplighter Court took pictures of the Acura at 6:21 am and again at 8:44 am, 17 minutes after the police received a call about the robbery. Reid's address on Lamplighter Court is roughly 13 minutes (6.8 miles) away from the Valero on Dunston Avenue.

Based on this investigation and the information provided by the victims, Detective Sandlin applied for a warrant to place a GPS tracking device on the Acura. A magistrate issued the warrant on April 26, and Chesterfield detectives covertly placed a GPS tracker on the car on May 3.

## III.    The Tobacco Hut Robbery, Martin's Confession, and the Lamplighter Court Evidence

The next morning, a robber stole money and vaping products from a Tobacco Hut on Midlothian Turnpike in Richmond. The victim told police officers that the robber was armed with a handgun and fled the store through the back door. The Tobacco Hut had multiple security cameras that captured the robbery. The cameras show the robber wearing latex gloves and carrying a small blue or teal colored handgun. Video footage from the store's rear camera shows that the robber left the store and, about two minutes later, the Acura with the distinctive stickers on the passenger side rear windows drove by.

Police officers reviewed the Tobacco Hut footage and, after seeing the Acura, reviewed the car's GPS tracking data.  They determined that the car left the Tobacco Hut about eight minutes after the robbery and returned to the Lamplighter Court apartment.  Plain-clothes detectives from Chesterfield County began surveilling the Acura.  Later that morning, they saw the driver of the Acura, a man matching the description of the robber, enter the Lamplighter Court apartment for a few minutes, exit, and return to the Acura.  As the car drove off, Chesterfield County officers conducted a felony traffic stop.  The officers identified the Acura's driver as Kumkio Martin.

Martin was transported to Richmond Police Department's Third Precinct station.  At the station, Detective Marley Williams advised Martin of his *Miranda* rights.  Martin signed a form indicating that he understood his rights, that he was being interviewed about the commission of a felony, and that he wished to waive his rights and make a statement.

Martin admitted to Detective Hylton that he robbed the Tobacco Hut.  He explained that he needed money because he was behind on rent and payments he owed to Aaron's, a rent-to-own furniture store.  He also admitted to participating in the Your Store attempted breaking and entering and the BP robbery but claimed that his father was the perpetrator.

Martin admitted to Hylton that he used the blue/teal handgun and said that it belonged to his girlfriend, Breona Reid.  He also said that the gun and some of the clothing he used in the Tobacco Hut robbery were at Reid's apartment at Lamplighter Court.  Martin gave Hylton consent to search the Acura and his cell phone.

Based on the video footage from the businesses' security cameras, the victims' statements, the investigations by Richmond and Chesterfield police officers, and the identification of the Acura's license plate using the Flock database, Detective Sandlin applied for a search warrant for

the Lamplighter Court apartment.  A magistrate issued the search warrant.  During the search, officers found multiple items, including a small teal handgun, wigs, and money.

Martin argues that the use of the Flock database to identify the Acura's license plate violated his Fourth Amendment rights.  He asks the Court to suppress any evidence derived from the use of the database.

## ARGUMENT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. The Supreme Court has "expanded our conception of the Amendment to protect certain expectations of privacy."  *Carpenter v. United States*, 585 U.S. 296, 304 (2018).  In *Carpenter*, the Court held that people have a reasonable expectation of privacy in the record of the totality of their physical movements as captured by cell-site location information collected by mobile phone providers.  *Id*. at 310.

In *Leaders of a Beautiful Struggle v. Baltimore Police Department*, the plaintiffs sought a preliminary injunction against an aerial surveillance program that allowed law enforcement to track every outdoor movement of every person in Baltimore.  2 F.4th 330, 341 (4th Cir. 2021) (en banc).  The data collected by the surveillance program was retained for "at least" 45 days.  *Id*.  The Fourth Circuit applied *Carpenter*'s reasoning and held that the program's comprehensive and prolonged tracking violated reasonable expectations of privacy, and that law enforcement must obtain a warrant before accessing the resulting data.  *Id*. at 333.

Martin asks this Court to expand the reach of *Carpenter* and *Leaders of a Beautiful Struggle* to cover the police's use of the Flock database.  The Court should decline to do so.  There is no reasonable expectation of privacy in a car's license plate number or in partial information about

the car's trips on public thoroughfares. And Martin has failed to allege, let alone show, that Flock's cameras and the ALPR database allowed officers to track the totality of his movements. Instead, the facts show that the police used the ALPR database to obtain a handful of pictures of the Acura on public roads.

But even if the Court agrees with Martin and finds that the use of the Flock database was a "search" under the Fourth Amendment, it should not suppress the resulting evidence. The officers acted in good faith reliance on binding appellate precedent and valid search warrants. The good-faith exception to the exclusionary rule therefore applies here.

## I.    No Fourth Amendment right has been infringed because Martin has not shown any legitimate expectation of privacy.

An unreasonable search within the meaning of the Fourth Amendment occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Martin bears the burden of showing, by a preponderance of the evidence, that he had such an expectation. *United States v. Castellanos*, 716 F.3d 828, 832-33 (4th Cir. 2013). This requires showing that he had a "subjective expectation of privacy," and that it was "an expectation that society is willing to recognize as reasonable." *Id.* at 832; *see also United States v. Rose*, 3 F.4th 722, 727 (4th Cir. 2021).

Martin's motion neither identifies nor describes any evidence supporting a subjective expectation of privacy. *See* Def.'s Mot., ECF No. 16 at 1-6. But even if he could show that he had such an expectation, it would not have been objectively reasonable. Consider the three possibilities: an expectation of privacy in (1) the Acura's license plate number, (2) the Acura's movements on public thoroughfares, or (3) the limited subset of Martin's movements captured by Flock cameras.

**A. There is no reasonable expectation of privacy in a license plate number.**

The Flock database was used to identify the Acura's license plate number. *See* Def. Mot. at 2. There is no reasonable expectation of privacy with respect to a car's license plate number, which must, by law, be publicly displayed. *See* Va. Code Ann. § 46.2-715; *New York v. Class*, 475 U.S. 106, 114 (1986) ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile"); *United States v. George*, 971 F.2d 1113, 1120 (4th Cir. 1992) ("[O]ne does not have a reasonable expectation of privacy in the visible exterior parts of an automobile that travels the public roads and highways").

Indeed, courts across the country have rejected the argument that collecting a license plate number without a warrant violates the Fourth Amendment. *See, e.g.*, *Meeks v. McClung*, 2023 WL 8791686, at *7 (S.D. W.Va Dec. 19, 2023); *Becerra v. City of Albuquerque*, 2023 WL 7321633, at *2 (10th Cir. Nov. 7, 2023); *Chaney v. City of Albany*, 2019 WL 3857995, at *9 (S.D.N.Y. Aug. 16, 2019); *United States v. Miranda-Sotolongo*, 827 F.3d 663, 667-68 (7th Cir. 2016); *United States v. Diaz-Castaneda*, 494 F.3d 1146, 1151 (9th Cir. 2007); *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006). This Court should do the same.

**B. There is no reasonable expectation of privacy in a car's movements on public thoroughfares.**

The images of the Acura stored on Flock's database show the car on public roads. For example, Detective Hylton used the database to find a picture of the Acura on Reams Road. Another picture of the car was taken at the intersection of Stella Road and Lamplighter Court.[1]

---

[1] Martin alleges that the "Richmond Police Department has placed a Flock Camera directly at the entrance to the [Lamplighter Court] apartment complex to monitor, 24/7, anyone who leaves or

There is no reasonable expectation of privacy in photographs of cars while they are on public roads. As the Supreme Court has stated, "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). Such movements are "voluntarily conveyed to anyone who wanted to look." *Id.*; *see also Cardwell v. Lewis*, 417 U.S. 583, 590 (1974) ("A car has little capacity for escaping public scrutiny," as "its occupants and its contents are in plain view" while on public roads); *George*, 971 F.2d at 1120.

### C. Martin has neither alleged nor shown that Flock's cameras and ALPR database allowed officers to track the totality of his movements.

#### 1. The actual use of the Flock database here was far more limited than Martin's motion implies.

Martin alleges that Flock's cameras permit "high resolution constant 24/7 surveillance," and that the company's technology "places in the hands of law enforcement unprecedented[] access to private details of citizens' lives through indiscriminate, suspicionless, and constant monitoring." Def. Mot. at 2. But missing in this Orwellian depiction is any allegation that law enforcement tried to or even could have used Flock's database to constantly monitor Martin's movements or access any private details about his life.

Instead, the facts show that Richmond and Chesterfield detectives used a handful of photos of the Acura for the limited purpose of identifying the car's license plate number. These pictures

---

arrives at the apartments." Def. Mot. at 2. In fact, the camera is at the intersection of two public roads, Stella Road and Lamplighter Court, and it cannot be used to "monitor, 24/7" the comings and goings from any of the Lamplighter Court apartments. This is because residents of these apartments may exit either from Stella Road or from Lamplighter Drive. *See* Ex. 2 at 5.

Moreover, using cameras to observe the outside of a residence does not violate the Fourth Amendment. *See California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.").

were taken on public roads and do not reveal the identity of or any personal details about the car's driver. Take the two pictures of the Acura from Flock cameras that Martin identifies in his motion. Def. Mot. at 4. These images show the car, its license plate, its distinctive window stickers, and little else. Martin does not allege that they show him driving the car, or that he had any expectation of privacy in the car's exterior at the time these pictures were taken.

Courts considering similar facts have regularly denied defendants' Fourth Amendment claims. For example, in *United States v. Rubin*, the government charged the defendant with Hobbs Act robbery and brandishing a firearm in furtherance of a crime of violence. 556 F. Supp. 3d 1123, 1124 (N.D. Cal. 2021). Surveillance footage from a Safeway showed the defendant stealing medications "while wielding a (possibly fake) firearm." *Id*. Shortly after the robbery, the footage showed the defendant entering a blue Jaguar that was parked near the store. *Id*.

Without a warrant, a police officer used an ALPR database to identify the Jaguar and its license plate. *Id*. at 1125. The officer determined that the defendant was the registered owner of the car, and then requested a warrant to place a GPS tracking device on the Jaguar for 30 days. *Id*. at 1125-26. The warrant was issued, and officers placed a tracker on the car. *Id*. at 1126. Five days later, the police obtained another warrant and searched the defendant's motel room. *Id*. There they found prescription medications, a bulletproof vest, and clothing matching the items in the surveillance video from the Safeway robbery. *Id*.

The defendant moved to suppress the fruits of the ALPR database search. *Id*. The court denied the motion, holding that accessing the database did not infringe upon any Fourth Amendment right. *Id*. at 1127. The court found that "there is no reason to believe that the database provided a detailed log of [the defendant's] movements," and it "revealed little more than where [the defendant] was probably living." *Id*. at 1129. It was therefore "clear that the information was

not remotely comparable to the 'detailed, encyclopedic' information at issue in *Carpenter*." *Id.* at 1130. So too here.

Similarly, in *United States v. Porter*, the government charged the defendant with three counts of robbery and one count of brandishing a firearm. 2022 WL 124563, at *1 (N.D. Ill. Jan. 13, 2022). A man robbed three banks. *Id.* Surveillance footage from one of the banks showed a man matching the description of the robber "exit[ing] a silver Ford Explorer with a large, white decal on the rear window and walk[ing] toward the [bank] immediately before the robbery. A few minutes later, that man returned to the vehicle." *Id.* Without a warrant, officers used an ALPR database to identify the car and found that it was registered to the defendant. *Id.* The officers then obtained a warrant to install a GPS tracking device on the car. *Id.*

The defendant moved to suppress "all evidence obtained from the license plate reader database search." *Id.* at *2. The court denied the motion. *Id.* at *3. It explained that use of the database did not infringe upon a reasonable expectation of privacy because "the database query response did not reveal intimate details of [the defendant's] daily life, nor did it track his every movement." *Id.* "Rather, the query produced limited images of [the defendant's] vehicle at public locations." *Id.*

*Rubin* and *Porter* are not outliers. *See, e.g.*, *United States v. Jiles*, 2024 WL 891956, at *16-19 (D. Neb. Feb. 29, 2024) (use of cameras and an ALPR database operated by Vigilant Solutions is not a "search" within the meaning of the Fourth Amendment); *United States v. Bowers*, 2021 WL 4775977, at *2-4 (W.D. Pa. Oct. 11, 2021) (contrasting information from an ALPR database with the cell phone data at issue in *Carpenter* and holding that using ALPR data does not violate the Fourth Amendment); *United States v. Brown*, 2021 WL 4963602 (N.D. Ill. Oct. 26,

2021).  Indeed, Martin does not cite, and the government has not located, any case holding that use of an ALPR database to identify a car's license plate number violates the Fourth Amendment.

### 2. Flock's cameras and ALPR database do not implicate the concerns raised in *Carpenter and Leaders of a Beautiful Struggle*.

Martin has not alleged, much less shown by a preponderance of the evidence, that law enforcement used Flock's cameras and database to access any private details about him or his movements.  That alone is fatal to Martin's motion, which must allege a Fourth Amendment violation and a "causal relationship" between the violation and the discovery of the evidence sought to be excluded.  *United States v. Clark*, 891 F.2d 501, 505 (4th Cir. 1989); *see also Segura v. United States,* 468 U.S. 796, 815 (1984) ("[s]uppression is not justified unless the challenged evidence is in some sense the product of illegal governmental activity" (internal quotation marks omitted)).  But even if Martin could make such allegations, the Court should reject his effort to contort *Carpenter* and *Leaders of a Beautiful Struggle* to fit the facts here.

The holdings in those cases were narrow.  Both stand for the proposition that a reasonable privacy expectation is implicated when the government accesses data that can be used to track the *totality* of a person's movements over a sustained period of time.  *See Carpenter*, 585 U.S. at 315 ("[T]his is not a case about . . . a person's movement at a particular time.  It is about a detailed chronicle of a person's physical presence compiled every day, every moment, over several years."); *Leaders of a Beautiful Struggle*, 2 F.4th at 344 (warrantless access of data from a system that "enable[s] police to glean insights from the whole of individuals' movements" invades a reasonable expectation of privacy).  And both cases emphasized the highly *personal* nature of the collected information.  *See Carpenter*, 585 U.S. at 311 (reasoning that "the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations" (internal

quotation marks omitted)); *Leaders of a Beautiful Struggle*, 2 F.4th at 342 (reasoning that the data "open[ed] 'an intimate window' into a person's associations and activities" (quoting *Carpenter*, 585 U.S. at 311)).

Neither Martin's motion nor the accompanying declaration of Lars Daniel alleges that Flock's cameras and database were used to track the totality of Martin's movements. Most of Daniel's declaration purports to describe ALPR technology "in general." *See* ECF No. 16-1 at ¶¶ 13-30; 48-49. The declaration does not allege what, if any, of these technological features were used by or made available to the officers investigating Martin's case.

Martin alleges that Flock uses "machine learning" to identify "an entire 'vehicle fingerprint'" based on photographs of a car. Def. Mot. 1. Daniel's declaration defines a "Vehicle Fingerprint" as including a car's "make, type, color, license plate, state of the license plate, covered plates, missing plates, and unique feature[s] of the vehicle such as a roof rack and bumper stickers." ECF No. 16-1 at ¶ 39. Of course, all of this information about a car is publicly available, and there is no reasonable expectation of privacy in the exterior of an automobile. *George*, 971 F.2d at 1120. Indeed, it was the distinctive stickers on the Acura's passenger windows, plainly visible and captured by multiple local business security cameras, that led to Officer Redford identifying the car from among thousands of photographs. *See* Ex. 1 at 2.

Martin also alleges that Flock's ALPR database could be used "to track the movement of vehicles across jurisdictions for as long as the data is stored, or find every vehicle to pass a location at a certain date or time." Def. Mot. at 1-2. Similarly, Daniel's declaration states that "[i]ncreasing the number of Flock cameras within an area could lead to a more granular determination of a person's movements" and "allow[] for tracking and observation of individuals as they move through different zones." ECF No. 16-1 at ¶ 47. But Martin's motion includes no allegation about

the density of Flock cameras in operation in Richmond and Chesterfield County. Nor has Martin alleged that law enforcement used Flock's cameras and database to track his movements across multiple jurisdictions. As Daniel's declaration acknowledges, "Flock cameras do not include facial recognition capabilities," Flock only stores the pictures of cars for 30 days, and the hypothetical ability to track individuals as they move through different areas depends critically on the number and density of cameras in operation. *Id.* ¶¶ 39, 47-48. Speculation about potential future capabilities of Flock cameras does not entitle Martin to suppression of lawfully obtained evidence in this case. *Cf. Segura*, 468 U.S. at 816 (concluding that the warrantless entry of petitioners' apartment did not require suppression of evidence seized pursuant to a valid search warrant because it was "pure speculation" that "if the agents had not entered the apartment, petitioners might have arranged for the removal or destruction of the evidence").

It is true, as Martin contends, that officers used "high resolution Flock photographs" to identify the Acura's license plate number and to confirm that the car was on certain public roads at certain times. Def. Mot. 2. But Martin does not explain how the use of these photos is any different than using images from a pole or traffic-light camera. Use of such images without a warrant does not violate the Fourth Amendment. *See Leaders of a Beautiful Struggle*, 2 F.4th at 345 ("People understand that they may be filmed by security cameras on city streets"); *United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring) (short-term monitoring of "a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable"); *United States v. Vankesteren*, 553 F.3d 286, 290 (4th Cir. 2009) ("Videotaping of suspects in public places, such as banks, does not violate the [F]ourth [A]mendment; the police may record what they normally may view with the naked eye.").

Courts have rejected similar attempts to shoehorn complaints about ordinary investigative methods into a *Carpenter*-style mosaic theory.  For example, in *United States v. Tuggle*, police officers installed three video cameras on public property.  4 F.4th 505, 510 (7th Cir. 2021).  They used these cameras to surveil the defendant's home for 18 months without a warrant.  *Id*.  The cameras "recorded around the clock," and the officers could "remotely zoom, pan, and tilt the cameras and review the camera footage in real time."  *Id*. at 511.  They could also review all of the footage later, as it was stored at an FBI field office.

The Seventh Circuit held that this "extensive pole camera surveillance" did not constitute a "search" under the Fourth Amendment.  *Id*.  The "government's use of a technology in public use, while occupying a place it was lawfully entitled to be, to observe plainly visible happenings" was permissible without a warrant.  *Id*.  Put another way, cameras do not "transform[] otherwise lawful visual surveillance into unconstitutional technological surveillance."  *Id*. at 514.

The court also contrasted the use of camera footage with the cell phone data at issue in *Carpenter*.  It explained that while stationary cameras in public locations can "capture[] an important sliver of [a defendant's] life," they do not "paint the type of exhaustive picture of his every movement that the Supreme Court has frowned upon."  *Id*. at 524.  Additionally, "[g]iven their immobile nature, the cameras could not make out an exhaustive record of the defendant's 'hitherto private routine.'"  *Id*. at 524-525.  *See also United States v. Hay*, 2024 WL 1163349, at *7-8 (10th Cir. Mar. 19, 2024) (warrantless surveillance for an extended period of time using pole cameras does not violate the Fourth Amendment); *Bowers*, 2021 WL 4775977, at *5 (contrasting the use of ALPR technology with the "all-encompassing and near-perfect surveillance" with which *Leaders of a Beautiful Struggle* and *Carpenter* were concerned); *Jiles*, 2024 WL 891956, at *19 (same); *United States v. Yang*, 958 F.3d 851, 862-64 (9th Cir. 2020) (Bea, J., concurring).

The court in *Tuggle* made another observation that applies here: "as society's uptake of a new technology waxes," "expectations of privacy in those technologies wane." 4 F.4th at 510. Thus, today "Americans largely accept" that "ever-watching fixed cameras will monitor their movements." *Id.* Indeed, in this case "ever-watching fixed cameras" owned and operated by local businesses comprehensively recorded the robberies, the attempted breaking and entering, and the use of the Acura to facilitate these criminal activities.

In sum, Martin has identified no reasonable expectation of privacy that could support a viable Fourth Amendment claim. There is no expectation of privacy in a license plate number or in a car's movements on public thoroughfares. And Martin has failed to allege that law enforcement used Flock's cameras and ALPR database to track the totality of his movements. For these reasons, the Court should deny his suppression motion.

## II.    The good-faith exception applies.

Even if the Court finds that use of the ALPR database was an unconstitutional "search," it should not suppress the evidence derived from that search. The suppression of evidence is a remedy of "last resort" that is appropriate only when "the deterrence benefits of suppression" "outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 237 (2011). Suppression is not warranted "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). The officers involved here acted with an objectively reasonable good-faith belief in the lawfulness of their conduct.

The good-faith exception applies when officers conduct a search "in objectively reasonable reliance on binding appellate precedent." *Id.* at 231. The police accessed Flock's ALPR database in April and May of 2023. Based on the binding appellate precedent at that time, a "reasonably

well-trained officer" could not "have known that the search was illegal in light of all of the circumstances." *United States v. Stephens*, 764 F.3d 327, 336 (4th Cir. 2014).

As discussed above, well-established case law supports the notion that "there can be no reasonable expectation of privacy in a vehicle's exterior." *George*, 971 F.2d at 1119. *See Knotts*, 460 U.S. at 281; *Cardwell*, 417 U.S. at 590. Similarly, well-established case law supports the warrantless use of cameras on public property to observe happenings in public places. *See Vankesteren*, 553 F.3d at 290-291; *Leaders of a Beautiful Struggle*, 2 F. 4th at 345; *Carpenter*, 585 U.S. at 316. Against this backdrop, and in the absence of any binding case holding that the use of an ALPR database to obtain a license plate number is a "search" under the Fourth Amendment, it was objectively reasonable for the officers to believe that they could use the database without a warrant. *See, e.g.*, *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018) (holding that the good-faith exception applied to cell-site location information collected without a warrant before *Carpenter*).

The good-faith exception also applies when officers gather evidence based on an objectively reasonable reliance on a search warrant that is subsequently invalidated. *Leon*, 468 U.S. at 922. This is because any "error in such case rests with the issuing magistrate, not the police officer, and punishing the errors of judges is not the office of the exclusionary rule." *Davis*, 564 U.S. at 239 (cleaned up). The evidence here was gathered after officers obtained multiple search warrants, and it was objectively reasonable for the officers to rely on these warrants. Martin has not alleged that any of the affidavits used to secure the warrants contained misleading information, and the facts do not support such an allegation. *See Franks v. Delaware*, 438 U.S. 154 (1978). Nor has Martin challenged the facial validity of the warrants or alleged that the affidavits were "so

lacking in indicia of probable cause" as to render the issuance of the warrants relying on those affidavits "entirely unreasonable." *Leon*, 468 U.S. at 922.

"It is axiomatic that [c]ourts should not punish law enforcement officers who are on the frontiers of new technology simply because they are at the beginning of a learning curve and have not yet been apprised of the preferences of courts on novel questions." *United States v. Zelaya-Veliz*, 94 F.4th 321, 341 (4th Cir. 2024) (internal quotation marks omitted). Thus, even if the Court agrees with Martin, it should hold that the good-faith exception to the exclusionary rule applies, and it should therefore deny the suppression motion.

## <u>CONCLUSION</u>

The government respectfully requests that the Court deny Martin's motion for the foregoing reasons.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:  _____/s/_____

Stephen E. Anthony
Vetan Kapoor
Assistant U. S. Attorneys
Office of the U.S. Attorney
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
(804) 819-5400
(804) 771-2316 (fax)
Stephen.E.Anthony@usdoj.gov
Vetan.Kapoor@usdoj.gov

Date: April 1, 2024

## CERTIFICATE OF SERVICE

I certify that on April 1, 2024, I filed electronically the foregoing with the Clerk of Court

using the CM/ECF system, which will serve all counsel of record.


By: _____/s/_____

                  Stephen E. Anthony
                  Assistant United States Attorney
                  United States Attorney's Office
                  919 East Main Street, Suite 1900
                  Richmond, Virginia 23219
                  Phone: (804) 819-5400
                  Email: Stephen.E.Anthony@usdoj.gov